UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :
                                       S9 09 Cr. 983 (DAB)
        - v. -                    :

JAIRED JONES,                     :
    a/k/a "J Roc,"
                                  :
              Defendant.
                                  :
- - - - - - - - - - - - - - - - - x


**GOVERNMENT'S SENTENCING SUBMISSION**


                              PREET BHARARA
                              United States Attorney for the
                              Southern District of New York
                              Attorney for the United States
                                  of America.

MICHAEL D. MAIMIN
JESSICA A. MASELLA
Assistant United States Attorneys
    - Of Counsel -

**TABLE OF CONTENTS**

I.    BACKGROUND. . . . . . . . . . . . . . . . . . . . . . 1

      A.   The Charges and Trial.. . . . . . . . . . . . . . 2

      B.   The Applicable Sentencing Guidelines. . . . . . . 7

           1.   Quantity of Crack Cocaine. . . . . . . . . . 8

                a.   Quantity of Crack Cocaine Cooked at
                     Jones's Apartment in the Promenade. . . . 12

                b.   Quantity of Crack Cocaine Distributed by
                     Jones.. . . . . . . . . . . . . . . . . . 14

           2.   The Applicability of the Firearms Enhancement
                . . . . . . . . . . . . . . . . . . . . . . . 15

           3.   Obstruction of Justice.. . . . . . . . . . . 19

           4.   Applicable Guidelines Book.. . . . . . . . . 23

           5.   Offense Level. . . . . . . . . . . . . . . . 25

           6.   Criminal History Category. . . . . . . . . . 26

           7.   Sentencing Range.. . . . . . . . . . . . . . 27

      C.   The "Safety Valve". . . . . . . . . . . . . . . . 28

II.   DISCUSSION. . . . . . . . . . . . . . . . . . . . . . 31

      A.   Applicable Law.. . . . . . . . . . . . . . . . . 31

      B.   A Sentence Of 210 Months' To 262 Months'
           Imprisonment Would Be Sufficient, But Not Greater
           Than Necessary, To Achieve The Legitimate Purposes
           Of Sentencing.. . . . . . . . . . . . . . . . . . 34

III.  CONCLUSION.. . . . . . . . . . . . . . . . . . . . . 39

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA               :
                                             S9 09 Cr. 983 (DAB)
          - v. -                       :

JAIRED JONES,                          :
     a/k/a "J Roc,"
                                       :

               Defendant.              :
- - - - - - - - - - - - - - - - - - x

### GOVERNMENT'S SENTENCING SUBMISSION

**I.   BACKGROUND**

The Government respectfully submits this sentencing submission in connection with the sentencing of defendant Jaired Jones, a/k/a "J Roc," which is scheduled for October 9, 2012.[1] As this Court is aware, having sat through the Jones's trial, Jones was a member of a crack-distribution conspiracy that sold cocaine base, in a form commonly known as "crack" in both retail and wholesale quantities in the Bronx, New York.  Although Jones was far from a leader in the conspiracy, he was essential.  Not only did Jones sell crack in the Marble Hill projects for the conspiracy, but he supplied many members of the conspiracy with

---

[1]   The Government filed this submission via the Electronic Case Filing system on September 25, 2012.  Because of the length of the submission, for the ease of the Court, the defendant, and defense counsel, this submission has been altered only to add a table of contents and correct minor, non-substantive typographical errors.  No substantive changes have been made.

his apartment in which they could: meet; sleep; keep guns, drugs, and money; and cook crack.

Jones has shown no remorse for his actions; to the contrary, he has shown contempt for the Court by testifying falsely under oath at his trial, committing perjury and making a mockery of this Court by telling a tale that was not only contrary to the weight of the evidence and the jury's verdict, but to logic and common-sense.

A very significant sentence is appropriate in this case to punish Jones and deter others who would involve themselves in and aid a significant crack-distribution organization, and then blatantly perjure themselves in open court.

However, under the circumstances unique to this case, the Government recognizes that a sentence within the applicable United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") sentencing range, while appropriate, may not be necessary.

For these reasons, the Government respectfully requests that the Court impose a sentence of 210 to 262 months' imprisonment, which is below below the Guidelines ("Guidelines" or "U.S.S.G.") range of 360 months' to life imprisonment.

**A.   The Charges and Trial**

On May 1, 2012, a grand jury in this District handed up a two-count superseding indictment (the "Indictment") charging Jones in six counts.  Count One charged Jones with conspiring,

2

from at least in or about 2006 up to and including in or about
July 2010, to violate the narcotics laws of the United States –
in particular, to distribute or possess with intent to distribute
280 grams and more of cocaine base, in a form commonly known as
"crack," in violation of Title 21, United States Code, Sections
812, 841(a)(1), and 841(b)(1)(A) – in violation of Title 21,
United States Code, Section 846.  Count Two charged Jones with
carrying and using firearms during and in relation to, and
possessing firearms in furtherance of, the narcotics conspiracy
charged in Count One, and aiding and abetting the same, in
violation of Title 18, United States Code, Sections
924(c)(1)(A)(i), and 2.

Jones's trial began on May 10, 2012. On May 22, 2012, the
jury returned its verdict, finding Jones guilty on Count One and
not guilty on Count Two.  Moreover, the jury made special
findings with respect to Count One, determining unanimously and
beyond a reasonable doubt that: (1) the object of the conspiracy
charged in Count One was *both* distribution of crack cocaine and
possession with intent to distribute crack cocaine; and (2) Jones
was responsible for 280 grams or more of crack cocaine. (Tr. 994-
95).[2]

---

[2]     "Tr." refers to the trial transcript in this case;
        "PSR" or "Presentence Report" refers to the Presentence
        Investigation Report prepared by the Probation Office
        in connection with this sentencing.

3

Because this Court sat through the trial, this memorandum will not recount it in detail.  However, in summary, the evidence proved that Jones was a member of a crack distribution crew, run primarily by Rodney Person, a/k/a "Neff," and his right-hand man Lamar Smalls, a/k/a "Ugly."  This organization sold retail quantities of crack cocaine day and night in an area around College Avenue in the Bronx, and also sold retail quantities of crack cocaine in the Marble Hill Housing Projects, near Jones's home in the Promenade building in the Bronx.  Multiple workers operated in the College Avenue area of the Bronx, working pre-set shifts, sharing customers, and using a central telephone (referred to during trial as the "Clicker").  Jones worked in the College Avenue portion of the operation, though this was not his regular area.  (Tr. 81-82, 96-99, 128, 328, 344-45, 500, 503, 549-50).  Rather, Jones's primary sales territory was in the Marble Hill Housing Projects.  (Tr. 80-82, 120-23, 126, 135-36, 264-71 310, 313-15, 343, 353-54, 509-10, 557-58).  Although Jones asked to sell on College Avenue, where he thought he could make more money, Person insisted that he sell in the Marble Hill Housing Projects, and relatively infrequently also allowed him to sell on College Avenue.  (Tr. 96-99, 123, 128, 344-45, 354, 500, 503, 549-50).

The evidence at trial also demonstrated that Jones began selling crack cocaine with this organization no later than late

2005/early 2006, and continued selling, day in and day out, until at least May 2009.  (Tr. 82, 354).  Jones – like other street sellers in the organization – would sell a minimum of two or three packs (that is, two or three grams) of crack each day. (Tr. 124, 127, 313-14, 503-04).  In addition to street sales made by workers like Jones, the organization also sold wholesale quantities of crack cocaine, although Jones did not engage in those sales.

Jones did not only sell for the organization, though; he housed it.  Jones provided his apartment to the organization, and members of the organization would meet there, stay/live there, store crack cocaine and guns there, and cook crack there. Indeed, the organization – usually Person, but occasionally Damon Chapman, a/k/a "D Mo" – cooked enormous quantities of crack – hundreds of grams of crack each week – in Jones's apartment. (Tr. 113-19, 310-13, 315-16, 351-52, 506-08, 514-15).  That crack, for which Jones provided his apartment to cook and store, would be sold both on the street and to other dealers in larger quantities.

As so many drug-distribution organizations do, this organization kept guns, and made those guns available to its workers, such as Jones.  Indeed, the organization often stored the guns in Jones's house – in the safe to which Jones originally had the combination (although the combination was later changed),

and to which Jones had frequent access when the safe was opened. Jones took advantage of those guns; at least twice, Jones took the organization's guns to protect himself in the Marble Hill area, precisely where he was selling crack cocaine.  (Tr. 125-26, 119, 236, 245, 214-17, 356-57, 511-12, 515).

In addition to cross-examination, Jones's defense at trial lay primarily in his testimony.  The testimony was willfully false – that is, perjurious.  (Tr. 622-727).  Jones testified that he never agreed with anyone to sell crack cocaine; that all of the independent, non-cooperator proof of Jones's specific sales – undercover purchases from Jones (using the Clicker), an arrest of Jones where he threw crack cocaine to the ground, and text messages in Jones's phone with one of his customers – constituted pretty much the universe of his sales of crack cocaine; that he only bought 10 grams of crack one time which he sold over the years; that he also was given two grams of crack another time which he sold over the years; that he was unaware of the organization's narcotics activities; that he was unaware of the narcotics activities in his own house; that sheer coincidence led to his selling crack cocaine on multiple occasions to an undercover officer using the organization's Clicker; that, in spite of Detective Malave's specific testimony, he never told Robert Walker, a/k/a "Mongo," to ask Detective Malave 20

questions when Detective Malave bought crack from Walker.[3]  It was ridiculous on its face, changed multiple times during Jones's testimony, was internal inconsistent, and generally made no sense.  It contradicted all of the other evidence in the case. And, if true, it meant that Jones was not guilty of the offense charged, and, in any case, had never approached the 28-gram threshold of Title 21, United States Code, Section 841(b)(1)(B), much less the 280-gram threshold of Section 841(b)(1)(A).

The jury, faced with this overwhelming evidence, specifically rejected Jones's testimony as false, and found Jones guilty of participating in a conspiracy to distribute and possess with intent to distribute 280 grams and more of cocaine base, in a form commonly known as "crack."  The jury also found that the Government had not met its burden of proving the Section 924(c) count beyond a reasonable doubt.  Accordingly, the jury convicted Jones on Count One, and acquitted Jones on Count Two.

## B.   The Applicable Sentencing Guidelines

The Presentence Report ultimately sets forth the correct applicable Guidelines range, but does so based on a flawed calculation.  There are two flaws to the calculation, which ultimately cancel one another out: (1) in light of *ex post facto* concerns, the Court must use the version of the Guidelines in

---

[3]   Had Jones admitted just that, he would have admitted to his participation in a conspiracy to sell crack cocaine, which he denied throughout his testimony.

effect at the time of Jones's offense, rather than at the time of his sentencing, which means that Jones is not subject to a two-level enhancement for maintaining a premises for the purposes of manufacturing or distributing a controlled substance (PSR ¶ 35); and (2) Jones merits a two-level enhancement for obstructing the administration of justice by providing false testimony, but the Probation Office does not add that enhancement, but rather "defer[s] to the Court in situations such as these" (PSR ¶ 38).

There are three specific determinations that this Court must make in calculating Jones's offense level: (1) the quantity of crack for which Jones is liable, pursuant to U.S.S.G. § 2D1.1(c); (2) the applicability of an enhancement for firearm possession, pursuant to U.S.S.G. § 2D1.1(b)(1); and the applicability of an obstruction enhancement, pursuant to U.S.S.G. § 3C1.1. Additionally, this Court must determine the appropriate Guidelines book to use: the Guidelines in effect as of November 1, 2008 (the "2008 Guidelines"), when Jones committed the offense of conviction; or the Guidelines in effect as of November 1, 2011 (the "2011 Guidelines"), when Jones will be sentenced.

### 1.    Quantity of Crack Cocaine

Under the Guidelines:

> With respect to offenses involving contraband
> (including controlled substances), the
> defendant is accountable for all quantities
> of contraband with which he was directly
> involved and, in the case of a jointly
> undertaken criminal activity, all reasonably

8

> foreseeable quantities of contraband that
> were within the scope of the criminal
> activity that he jointly undertook.

U.S.S.G. § 1B1.3, comment., n.2; *see also*, U.S.S.G. § 2D1.1,
comment. (nn.6, 12); *Witte* v. *United States*, 515 U.S. 389, 393
(1995); *United States* v. *Greenfield*, 44 F.3d 1141, 1149 (2d Cir.
1995) (concluding that, under U.S.S.G. § 1B1.3(a)(1)(B), a
co-conspirator shall be held accountable at "sentencing for 'all
reasonably foreseeable acts and omissions of others in
furtherance of the jointly undertaken criminal activity'"").
Accordingly, when a defendant joins a conspiracy, but is only
directly or personally involved in a portion of that conspiracy,
he is not accountable at sentencing for unforeseeable co-conspir-
ator conduct beyond his involvement. *United States* v. *Chalarca*,
95 F.3d 239, 244 (2d Cir. 1996).

In considering whether certain acts constitute "relevant
conduct," two particularized findings are relevant: "(1) that the
scope of the activity to which the defendant agreed was
sufficiently broad to include the relevant co-conspirator conduct
in question; and (2) that the relevant conduct on the part of the
co-conspirator was foreseeable to the defendant." *United States*
v. *Johnson*, 378 F.3d 230, 236 (2d Cir. 2004) (internal quotations
and citations omitted); *see also*, U.S.S.G. § 1B1.3, comment.
(n.2).

In *United States* v. *Studley*, 47 F.3d 569 (2d Cir. 1995), the Second Circuit observed that "[t]he relevant inquiry is what role the defendant agreed to play in the operation, either by an explicit agreement or implicitly by his conduct," *id.* at 575. Importantly, a defendant who contends that he should not be held responsible for the "entire range of misconduct attributable to the conspiracy," bears the burden of demonstrating "lack of knowledge and lack of foreseeability." *United States* v. *Martinez-Rios*, 143 F.3d 662, 677 (2d Cir. 1998).

Judge Posner has summarized the effect and operation of this rule: "Anyone who agrees to join a criminal undertaking is a conspirator, and he is liable for all the criminal acts of the conspiracy that are foreseeable to him, . . . regardless of how large or small his own role is." *United States* v. *Almanza*, 225 F.3d 845, 846 (7th Cir. 2000). The Second Circuit has made clear the broad application of these principles in the drug context:

> Thus, when the calculation of the base offense level depends on the quantity of narcotics attributable to a defendant who was a member of a narcotics distribution conspiracy, we have concluded that all transactions engaged in by him or by his coconspirators may be considered if the transactions were either known to him or reasonably foreseeable to him. . . . In order to sentence a defendant on the basis of the total amount of narcotics seized from his coconspirators, the court is not required to conclude that the defendant had actual knowledge of the exact quantity of narcotics involved in the conspiracy; it is sufficient

> if he could reasonably have foreseen the
> quantity involved.

*United States* v. *Negron*, 967 F.2d 68, 72 (2d Cir. 1992)

(citations omitted).  Applying these principles, for example, in

2003, Judge Sweet held all members of the "Purple Crew"

responsible for all of the crack cocaine sold by that

organization.  *See United States* v. *Birkett*, S1 99 Cr. 338 (RWS),

2003 WL 22940486, at *3 (S.D.N.Y. Dec. 15, 2003); *see also*,

*United States* v. *Allen*, 644 F. Supp. 2d 422, 433-34 (S.D.N.Y.

2009) (Scheindlin, J.) (holding that, where defendants were

employees of a crack organization, even if they were "paid only

for the crack cocaine that they personally sold," the defendants

were responsible for the "full scope of the Organization's

distribution").

Here, because Jones made his apartment available to the

conspiracy to cook crack, there can be no question that he is

responsible for all the crack cooked and distributed by the

conspiracy during the time of his involvement.  It is useful,

however, to also calculate how much crack cocaine Jones himself

distributed during that period, even though such a calculation

does not factor into the ultimate determination of the applicable

Guidelines.

           a.   Quantity of Crack Cocaine Cooked at Jones's
               Apartment in the Promenade

The testimony at trial demonstrated that Jones allowed the organization to cook tens of kilograms of crack cocaine at his apartment during his involvement in the organization.  This calculation can be made by simple multiplication:

*(Average grams of crack cooked per week) x (weeks)*

First, Jones was involved in the organization for over 175 weeks.  Walker explained that Jones was already selling with Person's organization when Walker met Jones at the end of 2005 or beginning of 2006. (Tr. 81-82). Jones sold at least through May 2009: (1) Jeremiah Smith, a/k/a "Banger," explained that he saw Person supply Jones with packs of crack cocaine "every other day" up through May 2009 (Tr. 354); (2) Jones was still selling to his customer "Phx" as late as May 2009, as demonstrated not only by the text messages on Jones's cellular telephones (GX 500D), but by Jones's own admissions during cross examination (Tr. 721-23); and (3) when Jones was arrested on June 17, 2009, he still had Ziploc baggies and the glass plate with a razor and crack residue in his apartment (Tr. 400, 402-03, 410).  That is over 175 weeks.

Second, Person and his organization cooked hundreds of grams of crack each week in Jones's apartment.  Walker saw Person cook anywhere from 50 to 150 grams of crack at a time in Jones's apartment three times a week, which means that he saw Person cook, on average, between 150 and 450 grams of crack each week.

(Tr. 246).  Similarly, Karon Powell, a/k/a "Rocky," saw Person
and Chapman cook up to 500 grams of crack at a time in Jones's
apartment.  (Tr. 507).[4]

If the conspiracy only cooked 300 grams of crack per week –
the average of what Walker saw – over the course 175 weeks, the
conspiracy would have cooked 52.5 kilograms of crack cocaine.
Indeed, if the conspirators only cooked 140 grams of crack per
week – that is, 20 grams per day, and less than the bottom end of
what Walker remembered seeing cooked in Jones's apartment – over
the course of 175 weeks, the conspiracy would have cooked 24.5
kilograms of cocaine.[5]

Under both the 2008 Guidelines and the 2011 Guidelines,
these quantities would easily trigger a base offense level of 38.

---

[4]     These quantities were consistent with the testimony
about how much crack was distributed by the many
workers for the organization.  In addition to the
organization selling wholesale quantities of crack
cocaine, Smith explained that he, alone, could sell
five packs in less than two hours.  (Tr. 350).

[5]     The Probation Office reports that "the Government
estimates, using an extremely conservative calculus,
that at bare minimum, 8.75 kilograms was manufactured
at JONES' apartment."  (PSR ¶ 19).  As discussed above,
however, even using an extremely conservative calculus,
far more crack cocaine was manufactured at Jones's
apartment; rather, the Presentence Report is referring
to the fact that, even if only 50 grams of crack were
cooked each week at Jones's apartment – one-third of
the bottom end of Walker's observations – 8.75
kilograms of crack cocaine would have been manufactured
over 175 weeks, which would still trigger the highest
base offense level under the 2011 Guidelines.

13

*See* U.S.S.G. § 2D1.1(c)(1) (2008) (trigger quantity of 4.5 kilograms of crack cocaine); U.S.S.G. § 2D1.1(c)(1) (2011) (trigger quantity of 8.4 kilograms of crack cocaine).

> b.   Quantity of Crack Cocaine Distributed by Jones

Although it is not relevant to the applicable Guidelines, this Court may choose to consider, as a factor under Title 18, United States Code, Section 3553(a), the quantity of crack cocaine that Jones distributed personally.

Jones personally sold a bare minimum of 1.75 kilograms of crack cocaine over the course of the conspiracy, and likely far, far more.  The evidence at trial demonstrated that Jones sold "everyday." (Tr. 127, 313).  Walker explained that the required minimum to sell with the organization was two to three packs per day. (Tr. 124).  This was consistent with Smith's testimony that he saw Person give Jones five to ten packs "every other day." (Tr. 314, 354).  Similarly, Powell saw Smalls give Jones "a pack or two" at a time on College Avenue, and also saw Smalls and Neff "give [Jones] packs" at the Promenade.  (Tr. 503-04).[6]

Even if Jones only sold an average of two packs (*i.e.*, two grams) a day and only sold five days a week, he would have sold

_____

[6]   This testimony was also consistent with Officer Pineiro catching Jones with 1.5 packs, weighing nearly two grams, on December 7, 2007, which is consistent with the quantities of crack Jones was selling every day. (Tr. 265-73; GX 1001).

14

1.75 kilograms of crack over 175 weeks.  Indeed, if he only sold
an average of two packs a day everyday, he would have sold 2.45
kilograms of crack over 175 weeks, and if he only sold an average
of three packs a day everyday, he would have sold 3.675 kilograms
of crack over 175 weeks.  If he sold five packs a day everyday,
he would have sold 6.125 kilograms of crack over 175 weeks.

### 2.  The Applicability of the Firearms Enhancement

Pursuant to U.S.S.G. § 2D1.1(b)(1): "[i]f a dangerous weapon
(including a firearm) was possessed, increase [the offense level]
by 2 levels."  The Second Circuit recently outlined the broad
impact of this rule:

> In order for a defendant's projected
> Guidelines sentence to be enhanced under
> § 2D1.1(b)(1), "'[t]he defendant need not
> have had personal possession, or even actual
> knowledge of the weapon's presence; the
> enhancement is required so long as the
> possession of the firearm was reasonably
> foreseeable to the defendant.'"  *United
> States* v. *Giraldo*, 80 F.3d 667, 677 (2d Cir.
> 1996) (quoting [*United States* v.] *Stevens*,
> 985 F.2d [1175] at 1188 [(2d Cir. 1993)])
> (abrogated on other grounds by *Muscarello* v.
> *United States*, 524 U.S. 125 . . . (1998)).
> Accordingly, if one member of a narcotics
> conspiracy possessed a firearm in furtherance
> of the conspiracy, the other members of the
> conspiracy who reasonably could have foreseen
> such possession are chargeable with
> possession under § 2D1.1(b)(1).  *United
> States* v. *Soto*, 959 F.2d 1181, 1186–87 (2d
> Cir. 1992).

*United States* v. *Batista*, 684 F.3d 333, 343 (2d Cir. 2012).  Even
if no firearm is ever found in physical proximity to a defendant

15

and nobody tells him about firearms, he can still qualify for this enhancement because the Court need only "determine whether, by preponderance of the evidence – including evidence relating to a defendant's specialized knowledge regarding the activities of drug gangs – possession of a firearm in connection with the offense was reasonably foreseeable by the defendant."  *Id.*

Here, there was significant evidence about the possession of firearms by members of the conspiracy – including Jones – and the storage of firearms at Jones's apartment.[7]

---

[7]     It is of little moment that the jury acquitted Jones on Count Two.  The Supreme Court has explicitly held that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence."  *United States* v. *Watts*, 519 U.S. 148, 157 (1997).  Indeed, in *Watts*, the Supreme Court addressed the very issue before this Court, holding that where:

> the jury acquitted the defendant of using or carrying a firearm during or in relation to the drug offense[, t]hat verdict does not preclude a finding by a preponderance of the evidence that the defendant did, in fact, use or carry such a weapon, much less that he simply *possessed* the weapon in connection with a drug offense.

*Id.* (emphasis in the original).  *Cf. United States* v. *Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005) (holding that a sentencing court may take into account acquitted conduct at sentencing, but "should consider the jury's acquittal when assessing the weight and quality of the evidence").  As described herein, the evidence of firearms was very strong.

There was extensive evidence of guns being kept in Jones's apartment for the organization.  (Tr. 119, 236, 245, 214-17, 515).[8]  The guns were held for the organization's workers in case those workers had problems.  (Tr. 356-57, 511).  This evidence, alone, would give rise to the two-level gun enhancement, as Jones's familiarity with drug gangs – of which he was a member – and the fact that the guns were stored, among other places, in his home, demonstrate both actual knowledge of the possession of firearms as well as the reasonable foreseeabilty of such possesion.  Indeed, Jones knew that the guns were being held in the safe in his house, as he "would ask for the gun" that was stored in the safe after Smalls changed the combination. (Tr. 126).

There was more damning evidence as well: two cooperators specifically discussed Jones's actual possession of firearms.

On one occasion, Walker witnessed Jones take a gun from inside the Promenade Apartment as he was "going out" into the Marble Hill area, and Jones told Smalls and Person – the leaders of the organization – that he "needed it for his protection because he had gotten into a previous altercation where he had got shot in his shoulder." (Tr. 126, 253, 258 (Walker)).  Walker

---

[8]     Indeed, at the time of Jones's arrest, even though other members of the organization had recently moved out of Jones's apartment and taken the safe with them, the NYPD still found bullets in Jones's apartment. (Tr. 402).

also testified that Jones "would ask for the gun" after Smalls changed the combination to the safe, so that he could use it "when he was going out, like the building I explained where he would be in front with Boobie." (Tr. 126 (Walker)). Walker had already testified that Jones and an individual named "Boobie" both sold crack in front of the same building in the are of the Marble Hill Houses. (Tr. 121-123 (Walker)); *see also* Tr. 315, 316 (Smith) (Jones worked by himself selling crack in Marble Hill, but was with Boobie and Serge when he did so)).

Powell also testified that there "was one time where J Roc [Jones] needed a gun because he had problems in the Marble Hill section. And he took the nine [millimeter gun] up to that, to the housing projects." (Tr. 511 (Powell)). Powell provided further details about that transaction. He stated that, after Jones came to College Avenue "hyped up" because he "had a problem," Jones talked to Smalls, after which Smalls directed Powell to give Jones a gun which was stored in the radiator at the College Avenue building. (Tr. 512 (Powell)). Powell understood that Jones had problems with an individual who was disrespecting him in the Marble Hill area, the same area in which Jones was selling drugs. (Tr. 556-557 (Powell)).

In light of the extensive evidence about the organization's possession of firearms – and, indeed, Jones's possession of firearms – the two-level gun enhancement is warranted.

18

### 3.    Obstruction of Justice

On May 16, 2012, Jones took the stand in his trial and testified falsely.  The jury specifically rejected his testimony. That, alone, requires this Court to impose a two-level obstruction enhancement, because "'[a] guilty verdict, not set aside, binds the sentencing court to accept the facts necessarily implicit in the verdict.'"  *United States* v. *Hourihan*, 66 F.3d 458, 465 (2d Cir. 1995) (quoting *United States* v. *Weston*, 960 F.2d 212, 218 (1st Cir. 1992)).  Here, because Jones testified that he had not agreed or conspired with anyone to distribute or possess with intent to distribute crack cocaine, and because Jones further testified to a total involvement with or knowledge of either ten or twelve grams of crack cocaine – depending on which part of his testimony one considers – the jury necessarily found Jones's testimony to be false in at least two material respects: the jury's guilty verdict necessarily found that Jones did, in fact, agree or conspire with one or more persons to distribute or possess with intent to distribute crack cocaine; and the jury's special findings necessarily found that Jones was involved with or reasonably foresaw the distribution or possession with intent to distribute of 280 grams or more of crack cocaine.

Indeed, Jones's testimony was so internally inconsistent, inconsistent with the evidence in the case, malleable throughout

19

his testimony, and self-evidently ludicrous that it would have been farcical had the subject not been so serious.  As just a handful of examples:

(1)   Jones claimed that the only crack he ever bought was 10 grams from "K" on Fordham Road after his December 7, 2007 arrest in Marble Hill (Tr. 633, 681, 686), but then claimed that he had also gotten two grams of crack from "Anthony" in the summer of 2007 (Tr. 678, 683);

(2)   Jones claimed that, when he bought 10 grams of crack from "K," he did not know how to bag or sell crack (Tr. 638), but then claimed that "Anthony" had explained to him how to bag, store, and sell crack the summer before he bought the 10 grams of crack from "K" (Tr. 683);

(3)   Jones claimed that he sold the two grams that he got from "Anthony" (Tr. 683-84), but then claimed that the two grams of crack were seized when he was arrested on December 7, 2007 (Tr. 264-71, 686; GX 801);

(4)   Jones claimed that he never told Walker to ask Detective Malave 20 questions (Tr. 687-88), in spite of Walker's and Detective Malave's testimony otherwise (Tr. 97-98, 328);

(5)   Jones attempted to explain the amazing coincidence of his making two sales to Undercover #597 using the Clicker – in spite of Jones's protests that he was not a part of the organization that used the Clicker as its common phone – by saying that he was "sneaky" and recognized Undercover #597's phone number as beginning with "646-678," and so called that number back on September 18, 2008, using the Clicker's phone memory (Tr. 647, 696), in spite of the fact that Undercover #597 never had a number that began with "646-678," or called from such a number, and Undercover #597 called the

20

Clicker on September 18, 2008, and not the other way around (Tr. 731).[9]

These are just five examples.  The Court had the opportunity to sit through Jones's testimony and see just how little of it was tethered to reality and/or logic.

Jones's perjurious testimony merits an obstruction-of-justice enhancement under the Sentencing Guidelines.  The Guidelines authorize a two-level upward adjustment:

> [i]f . . . the defendant . . . attempted to obstruct or impede[ ] the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and . . . the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct . . . .

U.S.S.G. § 3C1.1.  As the Supreme Court has explained, an enhancement for obstruction of justice is appropriate when a defendant "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." *United States* v. *Dunnigan*, 507 U.S. 87, 94 (1993).  Thus, the Second Circuit held in *United States* v. *Zagari*, 111 F.3d 307 (2d Cir.1997), that before applying an obstruction enhancement based on perjury, the sentencing court must find by a preponderance of

---

[9]     As with so much of his testimony, Jones's explanation of how he stumbled into multiple sales to Undercover #597 using the organization's common phone was nonsensical on its face, even without comparing it to other evidence.

the evidence "that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter."  *Id.* at 329; *cf. United States* v. *Garcia*, 413 F.3d 201, 220 n.15 (2d Cir. 2005) ("Judicial authority to find facts relevant to sentencing by a preponderance of the evidence survives *Booker*.").  In other words, "[b]efore imposing the adjustment, the district court must find that the defendant 'consciously act[ed] with the purpose of obstructing justice.'" *United States* v. *Lincecum*, 220 F.3d 77, 80 (2d Cir. 2000) (quoting *United States* v. *Case*, 180 F.3d 464, 467 (2d Cir.1999)).  *See also United States* v. *Agudelo*, 414 F.3d 345 (2d Cir. 2005) (denying the obstruction enhancement where there was no obvious lie); U.S.S.G. § 3C1.1, comment. (n.2).

Here, there is little room to describe Jones's testimony as anything but intentionally materially false and perjurious, made with the specific intent to mislead the jury and the Court, and purposefully obstructive of justice. Jones therefore "consciously act[ed] with the purpose of obstructing justice." *United States* v. *Lincecum*, 220 F.3d at 80 (quoting *United States* v. *Case*, 180 F.3d at 467).  The evidence militates for the Court to "make independent findings necessary to establish a willful" attempt by the defendant to obstruct justice.  *United States* v. *Dunnigan*, 507 U.S. at 95.  Because the "[C]ourt need do nothing more to satisfy *Dunnigan* than point to the obvious lie and find that the

22

defendant knowingly made a false statement on a material matter,"
*United States* v. *Williams*, 79 F.3d 334, 337-38 (2d Cir. 1996),
and, as described above, Jones uttered a litany of false
statements on material matters during his testimony –
contradicted by the facts, by logic, by common sense, and, most
damningly, by the jury's verdict – this Court can, and should,
find that Jones obstructed justice and therefore merits a two-
point enhancement for his offense level pursuant to U.S.S.G. §
3C1.1.

### 4.    Applicable Guidelines Book

Courts must use the Guidelines manual in effect on the date
of sentencing unless they determine that such use would violate
the *Ex Post Facto* Clause, in which case they must use the manual
in effect on the date that the offense was committed. See
U.S.S.G. § 1B1.11(b)(1); *see also* 18 U.S.C. § 3553(a)(4)(A)(ii)
(instructing courts to use the Guidelines in effect on the date
of sentencing).  The rendering of the Guidelines as advisory
raised the question: "[w]hether  application of a guideline
amended after the date of an offense violates the *Ex Post Facto*
Clause under the advisory Guidelines regime, as it did when the
Sentencing Guidelines were mandatory?"  *United States* v. *Ortiz*,
621 F.3d 82, 86 (2d Cir. 2010).  In light of a circuit split, the
Second Circuit decided to adopt the approach of the D.C. Circuit,
and find that, where "using the [amended] Guidelines created a

23

substantial risk that [the defendant's] sentence was more severe," the *Ex Post Facto* Clause would be violated, and the sentencing court would have to use the earlier Guidelines manual. *Id.* at 87 (brackets in original).

Here, there is a difference between the 2008 Guidelines and the 2011 Guidelines that specifically affects Jones.  As set forth above, Jones is subject to the same base offense level under the 2008 Guidelines and the 2011 Guidelines, and the gun enhancement and obstruction enhancement are the same in each set of Guidelines.  However, the 2011 Guidelines include an additional applicable enhancement that is not available in the 2008 Guidelines: "If the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance, increase by 2 levels."  U.S.S.G. § 2D1.1(b)(12) (2011).  Because that enhancement would raise Jones's offense level from 42 to 44, and his resulting Guidelines sentencing range from 360 months' to life imprisonment to simply life imprisonment, there is a substantial risk that Jones's sentence could be more severe if his Guidelines were calculated under the 2011 Guidelines.  Accordingly, it is appropriate to use the 2008 Guidelines.  *See*, *e.g.*, *United States* v. *Faison*, 393 Fed. Appx. 754, 761 (2d Cir. 2010) (summary order).[10]

---

[10]   Pursuant to the so-called "one-book rule," the Court may only use one Guidelines manual in determining a defendant's sentence; it "shall not apply, for example,

However, the selection of the 2008 Guidelines *requires* a finding of drug quantity that references the 2011 Guidelines. For example, if this Court only found that the offense involved 4.5 kilograms and more of crack cocaine – the trigger quantity for U.S.S.G. § 2D1.1(c)(1) (2008) – and, therefore, made no finding that the offense involved 8.4 kilograms or more of crack cocaine – the base offense level under the 2011 Guidelines would be 36, pursuant to U.S.S.G. § 2D1.1(c)(2) (2011), and, even if the two-level enhancement set forth in U.S.S.G. § 2D1.1(b)(12) (2011) applied, there would be no difference in the final Guidelines sentencing range between the 2008 Guidelines and the 2011 Guidelines, which would require application of the 2011 Guidelines.

### 5.   Offense Level

a.   The Guidelines provisions in effect as of November 1, 2008, apply in this case.

b.   Pursuant to U.S.S.G. § 2D1.1(c)(1), because the offense involved 4.5 kilograms and more –

---

one guideline section from one edition of the Guidelines Manual and another guideline section from a different edition of the Guidelines Manual." U.S.S.G. § 1B1.11(b)(2). *Cf. United States* v. *Kumar*, 617 F.3d 612, 628 (2d Cir. 2010) (finding that the portion of the "one-book rule" set forth in U.S.S.G. § 1B1.11(b)(3) does not violate the *Ex Post Facto* Clause).

and 8.4 kilograms and more[11] – of cocaine base, the base offense level is 38.

c.      Pursuant to U.S.S.G. § 2D1.1(b)(1), the offense level is increased by two because a dangerous weapon (including a firearm) was possessed.

d.      Pursuant to U.S.S.G. § 3C1.1, the offense level is increased by two because (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to the defendant's offense of conviction and any relevant conduct.

e.      Jones's total offense level is therefore 42.

6.      **Criminal History Category**

a.      Jones was convicted, as a youthful offender, on or about November 15, 2006, of Criminal Facilitation in the Fourth Degree, a Class A Misdemeanor, in Bronx County Supreme Court, for which he received a sentence of time served.  (PSR ¶ 46).  Because the conduct underlying this conviction is conduct that is part of the instant offense, this sentence is not counted and therefore results in zero criminal history points.  *See* U.S.S.G. §§ 4A1.2(a) and 4A1.2 comment. (n.1).

b.      Jones was convicted of disorderly conduct, a violation, on or about January 29, 2008, in Bronx Supreme Court, for which he received a sentence of conditional discharge.  On or about May 20, 2008, Jones was resentenced to a $150 fine and five days' community service.  Pursuant to U.S.S.G. § 4A1.2(c)(1), no criminal history points are added, and

---

[11]    As described above, the Court must make this finding in order to resolve the issue of which Guidelines manual to apply.

because the conduct underlying this conviction is conduct that is part of the instant offense, this sentence is not counted and therefore results in zero criminal history points.

c.   Accordingly, Jones has no criminal history points, resulting in a Criminal History Category of I.

### 7.   Sentencing Range

Based upon the calculations set forth above, at Offense Level 42 and Criminal History Category I, Jones's Guidelines sentencing range for Count One of the Indictment is 360 months' to life imprisonment, with a mandatory minimum of 120 months' imprisonment.  In addition, after determining Jones's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. At Guidelines level 42, the applicable fine range is $25,000 to $4,000,000.  In addition, pursuant to Title 21, United States Code, Section 841(b)(1)(A) and U.S.S.G. § 5D1.2(a)(1)&(c), the Jones's Guidelines term of supervised release is the mandatory minimum five-year term of supervised release.

The Probation Office recommends a Guidelines sentence of 360 months' imprisonment, to be followed by five years' supervised release. (PSR 22).  Although Jones merits a very substantial sentence – one well above the mandatory minimum – for the reasons set forth below, the Government respectfully requests that the Court impose a sentence within the below-Guidelines range of 210 to 262 months' imprisonment.

27

C.   **The "Safety Valve"**

In his sentencing letter, dated August 13, 2012, Jones states that he "is eligible for the safety valve."  (Sent. Ltr. 1).  Jones argues that: (1) he satisfies all five criteria necessary to qualify for "safety-valve" relief (Sent. Ltr. 3); (2) Jones "would not be held responsible for any guns," even under a preponderance-of-the-evidence standard (Sent. Ltr. 3); and (3) Jones testified truthfully at trial, and "any proffer statements [Jones makes] will be the same as any statements made at trial" (Sent. Ltr. 3-4).  Jones is incorrect.

Jones's narcotics conviction subjects him to a 10-year mandatory minimum prison sentence.  *See* 21 U.S.C. § 841(b)(1)(A). However, the safety-valve provisions set forth in Title 18, United States Code, Section 3553(f) and U.S.S.G. § 5C1.2 entitle a defendant to receive "a sentence in accordance with the applicable guidelines without regard to any minimum statutory sentence," provided the defendant meets five criteria: (1) the defendant has no more than one criminal history point; (2) the defendant "did not use violence or credible threats of violence or possess a firearm or other dangerous weapon . . . in connection with the offense"; (3) no one was killed or seriously hurt as a result of the offense; (4) the defendant was not an organizer, leader, manager, or supervisor in the offense and was not engaged in a continuing criminal enterprise; and (5) "not

28

later than the time of the sentencing hearing the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan."  18 U.S.C. § 3553(f)(1)-(5); U.S.S.G. § 5C1.2(a)(1)-(5).  Pursuant to U.S.S.G. § 2D1.1(b)(6), a defendant who meets these five criteria is also eligible for a two-level reduction in his or her offense level.

The Second Circuit has made clear that the defendant has the burden of proving, by a preponderance of the evidence, that he or she has met all five of the safety-valve criteria.  *United States* v. *Tang*, 214 F.3d 365, 371 (2d Cir. 2000); *United States* v. *Ortiz*, 136 F.3d 882, 883 (2d Cir. 1997); *United States* v. *Gambino*, 106 F.3d 1105, 1110 (2d Cir. 1997).  This remains the standard even after the Supreme Court's decision in *United States* v. *Booker*, 543 U.S. 220 (2005).  *See, e.g., United States* v. *Jimenez*, 451 F.3d 97, 102 (2d Cir. 2006) ("The fact that mandatory minimums have taken on increased significance after *Booker* . . . does not undermine our decision to place the burden of proof on the defendant to demonstrate his eligibility for safety-valve relief.").

This Court is required by statute (and is admonished by the Guidelines) to make its own determination as to whether a defendant satisfies the five conditions for safety-valve relief.

29

*See, e.g., United States* v. *Jeffers*, 329 F.3d 94, 98 (2d Cir. 2003); *United States* v. *Gambino*, 106 F.3d at 1110.

Jones is ineligible for "safety-valve" relief because he does not meet two of the criteria.  First, as is described in detail above, Jones possessed firearms – both actual and constructive possession – in connection with his offense.  *See United States* v. *Herrera*, 446 F.3d 283, 287-88 (2d Cir. 2006) (holding that even constructive possession of firearms at stash houses based on personal dominion and control was sufficient to deny "safety-valve" relief).  Jones cannot meet his burden to prove otherwise; indeed, the only "evidence" he has that he did not possess firearms was his own testimony which, as described above, should be rejected in its entirety.

Second, also as described in great detail above, Jones has not satisfied his burden of demonstrating that he has "truthfully provided to the Government all information and evidence [he] has concerning the offense."  18 U.S.C. § 3553(f)(5); *see also United States* v. *McKenzie*, 421 Fed. Appx. 28, 32-33 (2d Cir. 2011) (summary order).  To the contrary, Jones perjured himself at trial.  It is possible to engage in a successful "safety valve" proffer after committing perjury at trial, which proffer would necessarily include an admission of perjury.  *See, e.g., United States* v. *Jeffers*, 329 F.3d 94, 99-100 (2d Cir. 2003); *United States* v. *Castellanos*, 355 F.3d 56, 58, 60-61 (2d Cir. 2003).

30

Doing so, however, becomes more difficult even if – unlike here – a defendant satisfies all other "safety valve" criteria, as "prior perjurious acts may affect the defendant's credibility and his corresponding ability to satisfy the safety valve's truthful disclosure requirement." *United States* v. *Jeffers*, 329 F.3d at 99.  That is not, however, the case here.  Jones has represented that he will simply repeat his perjurious statements at any "safety valve" proffer.  (Sent. Ltr. 3-4).  The Government and Court need not engage in a futile exercise; rather, this Court can determine that Jones's proffer does not satisfy Section 3553(f)(5) based on his trial testimony alone.

## II.  DISCUSSION

### A.  Applicable Law

The United States Sentencing Guidelines (the "Guidelines") still provide strong guidance to the Court in light of *United States* v. *Booker*, 543 U.S. 220 (2005) and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).  Although *United States* v. *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  543 U.S. at 264.  As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" – that

"should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant" (§ 3553(a)(1)); the four legitimate purposes of sentencing (§ 3553(a)(2)); "the kinds of sentences available" (§ 3553(a)(3)); the Guidelines range itself (§ 3553(a)(4)); any relevant policy statement by the Sentencing Commission (§ 3553(a)(5)); "the need to avoid unwarranted sentence disparities among defendants" (§ 3553(a)(6)); and "the need to provide restitution to any victims" (§ 3553(a)(7)). *Gall* v. *United States*, 552 U.S. at 50 n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)  to afford adequate deterrence to criminal conduct;

(C)  to protect the public from further crimes of the defendant; and

        (D)  to provide the defendant with needed educational or
             vocational training, medical care, or other
             correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

    Courts may not presume that the appropriate sentence
necessarily lies within Guidelines range, but "the fact that
§ 3553(a) explicitly directs sentencing courts to consider the
Guidelines supports the premise that district courts must begin
their analysis with the Guidelines and remain cognizant of them
throughout the sentencing process."  *Gall*, 552 U.S. at 50 n.6.
Their relevance throughout the sentencing process stems in part
from the fact that, while the Guidelines are advisory, "the
sentencing statutes envision both the sentencing judge and the
Commission as carrying out the same basic § 3553(a) objectives,"
*Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the
Guidelines are "the product of careful study based on extensive
empirical evidence derived from the review of thousands of
individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also*
*Rita* v. *United States*, 551 U.S. at 349.  To the extent a
sentencing court varies from the Guidelines sentence, "[it] must
consider the extent of the deviation and ensure that the
justification is sufficiently compelling to support the degree of
the variance."  *Gall*, 552 U.S. at 50.

33

**B.    A Sentence Of 210 Months' To 262 Months' Imprisonment Would Be Sufficient, But Not Greater Than Necessary, To Achieve The Legitimate Purposes Of Sentencing.**

Jones's criminal conduct and atrocious conduct before this Court demand a very serious incarceratory sentence.  However, the unique intersection of the nature and circumstances of Jones's offense, Jones's role in the offense, and principles of proportionality[12] counsel for sentence somewhat below the advisory Guidelines sentencing range of 360 months' to life imprisonment.

As is described in detail above, and as the Court learned during trial, Jones was a worker in a wide-ranging crack distribution conspiracy.  However, he was also essential, for at least two reasons.  First, and most importantly, Jones supplied the headquarters to the conspiracy.  Because of Jones, the leaders of the conspiracy were able to cook up enormous quantities of crack cocaine fairly continuously, supplying other

---

[12]    Among the factors a sentencing court must consider in imposing sentence is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  Congress adopted Section 3553(a)(6) "to eliminate unwarranted disparities nationwide."  *United States* v. *Williams*, 524 F.3d 209, 215 (2d Cir. 2008).  Because Section 3553(a)(6) was intended to address national disparities, "a district court may — but is not required to — consider sentencing disparity among co-defendants under 18 U.S.C. § 3553(a)(6)."  *United States* v. *Johnson*, 567 F.3d 40, 54 (2d Cir. 2009) (citing *United States* v. *Frias*, 521 F.3d 229, 236 & n.8 (2d Cir. 2008)).

drug dealers and supplying addicts on the street.  Because of
Jones, the organization had a safe place in which it could store
its drugs, its money, and its weapons.  Because of Jones, the
organization had housing for its workers when they needed a place
to stay, ensuring those workers' loyalty and continued work.  In
short, because of Jones, the organization was able to operate
efficiently and ruthlessly.  Second, Jones was the sole worker
supplying one of the two territories in which the organization
operated: the Marble Hill Housing Projects.  Without Jones, the
organization's retail operations would have existed in only one
place – College Avenue – and any problems on College Avenue could
have caused the organization to fail.

That said, the Court also learned that others – such as
Person and Smalls – had true leadership roles.  Jones worked for
Person and Smalls as well as everyone else did.  Also, though
Jones occasionally took guns to defend himself when he went into
his drug-selling territory, his use of guns was less than that of
other members of the organization, and he was not the "muscle"
that certain other workers were.  Finally, although Jones sold
crack every single day, and did so successfully, he simply was
not as good at it as others, as was evidenced by his desire to
sell on College Avenue, where he thought he could make more
money.

Thus far, this Court has sentenced one of Jones's co-conspirators: Person.  This leader of the organization received a below-Guidelines sentence of ten years' imprisonment.  (The Government sought a higher sentence).

To be clear, although Person's conduct on the street may have been more serious than Jones's, Jones's conduct in this Courtroom was far more serious than Person's.  Person accepted responsibility; Person did not put the Government to its burden of proof or require the Government to prepare for trial; Person pled guilty early enough that the Government did not have to put cooperators at risk by "burning" them as it did with Jones;[13] and Person did not commit perjury before this Court.

In light of all of the circumstances in this case, a sentence that is sufficient, but not greater than necessary, to satisfy the goals set forth in Section 3553(a) may be approximated using a crude variant on the Guidelines.  If the Court takes as a baseline a sentencing range that begins at approximately the mandatory minimum to which Jones is subject,

---

[13]     Because the Government did not "burn" cooperators by the time of Person's plea, Person – like most of his co-defendants – received a significant break on the quantity of drugs attributed to him, as proof of a greater quantity would have required "burning" those cooperators.  That said, the Government ensured that the Court was aware of the proof at trial during Person's sentencing, as the Court is entitled to make its sentencing determination based on all relevant facts that are available.

and to which Person was sentenced: 120 months.  In Criminal History Category I, that would be 121-151 months, which corresponds to offense level 32.  Then the Court could approximate the effect of Jones's decision not to accept responsibility and to obstruct justice by adding three levels for failure to accept responsibility,[14] and another two levels for obstruction of justice, which would result in offense level 37. In Criminal History I, offense level 37[15] returns a Guidelines range of 210 to 262 months' imprisonment.

This methodology is very crude, particularly as Jones does not qualify for or merit any downward departures under the Guidelines.  However, it results in a reasonable approximation of a sentence that would punish Jones for his serious criminal conduct, in the light of the extraordinary quantum of proof arrayed against him and his decision to try to make a mockery of this Court, while also recognizing that Jones was only a worker in the organization – though one with the unique and essential responsibility of also supplying the organization with a headquarters – and that the Court has already sentenced a leader of the organization to ten years' imprisonment.

---

[14]   Typically, acceptance of responsibility results in a three-level reduction.  *See* U.S.S.G. § 3E1.1.

[15]   This offense level is also precisely halfway between the "baseline" offense level of 32 set forth herein and the actual applicable offense level of 42.

Accordingly, the appropriate sentence Count One would be 210 to 262 months' imprisonment, to be followed by five years' supervised release, as well as a mandatory $100 special assessment.  Such a sentence would be appropriate under the policies set forth in the Guidelines and under the section 3553(a) factors; among other things:

- it would take into account and reflect the nature and circumstances of the offense and the history and characteristics of Jones by reflecting the serious nature of the crime and the importance of Jones's role in that offense, as well as Jones's decision to lie repeatedly to the Court under oath in an attempt to obstruct justice, while tempering those factors with considerations of Jones's age and role in the offense (18 U.S.C. § 3553(a)(1));

- it would reflect the seriousness of the offense, which involved not only the non-stop distribution of crack cocaine in residential neighborhoods, and the possession of firearms in connection with that offense, but also an attempt to undermine the justice system that this Court represents through perjurious testimony (18 U.S.C. § 3553(a)(2)(A));

- it would afford deterrence to others who would both engage in the dangerous and harmful drug trade and attempt to undercut the justice system by lying, even when under oath (18 U.S.C. § 3553(a)(2)(B));

- it would protect the public from further crimes of Jones, who showed no signs of ceasing his drug-dealing and work with those who manufactured crack cocaine until he was arrested (18 U.S.C. § 3553(a)(2)(C)); and

- although it would fall below the applicable Guidelines range, it would be closely-related to that range, and, in light of all the 3553(a) factors, it would reflect both the Sentencing Guidelines and the pertinent policy statements issued by the Sentencing Commission and it would

38

> avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct (18 U.S.C. §§ 3553(a)(4)-(6)).

The goals of 3553(a), including punishment, deterrence, and recognition of the seriousness of Jones's crime, militate that this Court demonstrate the consequences of Jones's actions, both on the streets and in this Courtroom.  In light of all the factors set forth in Title 18, United States Code, Section 3553(a), the policies set forth in the advisory Sentencing Guidelines, the facts set forth in the Presentence Report and the arguments above, a below-Guidelines sentence of 210 to 262 months' imprisonment would be sufficient but not greater than necessary to comply with the purposes set forth in Title 18, United States Code, Section 3553(a)(2).

## III. CONCLUSION

For the foregoing reasons, a below-Guidelines sentence of 210 to 262 months' imprisonment on Count One, in addition to a fine of between $25,000 and $4,000,000, a term of five years' supervised release, and a $100 special assessment, would be

sufficient, but not greater than necessary, to achieve the

legitimate purposes of sentencing.

Dated:      New York, New York
            September 30, 2012

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney
                              Southern District of New York


                              _____
                              Michael D. Maimin
                              Jessica A. Masella
                              Assistant United States Attorneys
                              (212) 637-2238/2288