USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 8/2/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAIRED JONES,

               Petitioner,

-against-

UNITED STATES OF AMERICA

               Respondent.

16-cv-7107 (ALC)

09-cr-00983 (ALC)

**OPINION AND ORDER**

**ANDREW L. CARTER, United States District Judge:**

       Jaired Jones ("Jones" or "Petitioner"), proceeding *pro se*, moves this Court to correct, vacate, or set aside his conviction pursuant to 28 U.S.C. § 2255 (the "Petition"[1]). On May 22, 2012, a jury convicted Jones of conspiring to distribute 280 grams and more of crack cocaine, in violation of 21 U.S.C.§§ 841(b)(1)(A), 846, and he was later sentenced to 151 months' imprisonment to be followed by a five-year term of supervised release. *See* Judgment, 09-cr-00983, ECF No. 182.[2] The Court subsequently reduced Jones' sentence to 121 months' imprisonment following a Section 3582(c)(2) sentence-reduction motion. *See* Order, 09-cr-00983, ECF No. 205. The United States Court of Appeals for the Second Circuit affirmed the conviction. *See United States v. Medina*, 607 F. App'x 60 (2d Cir. 2015) (summary order). Jones challenges his conviction on the ground that he was denied effective assistance of counsel. Specifically, Jones argues that (1) his counsel was ineffective for failing to provide Jones with 3500 materials during

---

[1] The docketed "Petition" includes the Petition and a brief in support. Because it constitutes one document on the docket, *see* 16-cv-7107, ECF No. 1, the Court will refer to the electronic page numbers assigned by ECF.

[2] Some documents related to this Motion are docketed under the criminal case number (09-cr-00983) and others are docketed under the civil case number (16-cv-07107). Citations to the docket are distinguished here by case number.

trial, (2) his sentence is unconstitutional, and (3) his appellate counsel was ineffective for failing to petition for a writ of *certiorari*. For the reasons set forth below, Jones's Petition is **DENIED.**

## BACKGROUND

The following factual summary is derived substantially from the Government's response to the Petition. *See* Opposition, 16-cv-7107, ECF No. 14. By superseding indictment ("Indictment") filed on August 25, 2010, the Government charged Jones with the following criminal offenses: (a) conspiracy to violate the narcotics laws of the United States by distributing and possessing with the intent to distribute crack cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846 ("Count One") and (b) possession and use of a firearm in relation to a narcotics conspiracy, in violation of 18 U.S.C §§ 924(c)(1)(A)(i) and (2) ("Count Two"). *See* Indictment, 09-cr-00983, ECF No. 43; Tr. 926.[3]

### I.  Evidence Presented at Trial

Defendant's trial began on May 10, 2012 and concluded on May 22, 2012. The jury found Jones guilty of Count One and not guilty on Count Two. *See* Tr. 994-995; Order, 09-cr-00983, ECF No. 161. The Government's evidence included "nine witness—including three cooperating witnesses and multiple law enforcement officers, two of whom had purchased crack cocaine from Jones while working undercover—[,] a video created by Jones and posted on his Myspace page in which he . . . shows[s] off a large quantity of cash obtained from dealing crack cocaine" and "more than 40 items of physical evidence, photographs, and documents, including crack cocaine purchased or recovered from Jones," "mail recovered from Jones's apartment demonstrating that some of his co-conspirators lived with him, drug packaging materials recovered from Jones's apartment, and Jones's cellular telephones, which contained contact information for Jones's co-

---

[3] "Tr." refers to the trial transcript. *See* 09-cr-00983, ECF Nos. 96-97.

conspirators, and text messages with one of Jones's crack-cocaine customers." Opp., 16-cv-07107, ECF No. 14 at 2-3.

According to the Government's case, Jones "was a member of a crack distribution crew (the 'Crew'), run primarily by Rodney Person [and] Lamar Smalls" and that the Crew "sold retail quantities of crack cocaine day and night in an area around College Avenue in the Bronx, and also sold retail quantities of crack cocaine in the Marble Hill Housing Projects, near Jones's home in the Promenade building in the Bronx." *Id*. Tr. 50-51 (Mr. Robert Walker, a cooperating co-conspirator witness, testifying that he sold illegal drugs with other individuals, including Mr. Jones); Tr. 53-69 (Mr. Walker testifying that Mr. Rodney Person recruited him to sell drugs in the Bronx and that Mr. Lamar Smalls was Mr. Person's "right hand"); Tr. 72-74 (Mr. Walker testifying about the roles of co-conspirators Mr. Derick Woods and Mr. Jonathan Medina in the conspiracy); Tr. 80-82 (Mr. Walker testifying about Mr. Jones selling drugs given to him by Mr. Person); Tr. 83-85, 87-103, (Mr. Walker testifying about his role in the conspiracy, how the co-conspirators went about selling drugs in the Bronx and Mr. Jones's role in the conspiracy); Tr. 107-125 (Mr. Walker testifying that crack cocaine was kept in Mr. Jones's apartment in the Promenade building in the Bronx, that Mr. Person made crack cocaine in that apartment, that Mr. Jones would sometimes "bag" the crack cocaine, and that Mr. Jones sold crack cocaine in the Marble Hill Housing area); Tr. 353-354 (Mr. Jerimiah Smith, a cooperating witness, testifying that Mr. Jones was selling crack cocaine in Marble Hill and worked for Mr. Rodney Person who supplied him with crack cocaine).

One of Mr. Jones's co-conspirators named in the indictment, Mr. Robert Walker, testified that Jones began selling crack cocaine with this organization no later than late 2005/early 2006. Tr. 80-81. He continued to sell until at least May 2009. Tr. 354. Mr. Jones's primarily sold around

3

the Marble Hill Housing Projects. Tr. 120, 122, 123, 127, 135-136, 310, 313-315, 343, 353-354, 557. Jones also worked in the College Avenue portion of the operation, but this was not his regular area. Tr. 81-82, 96-97, 128, 344-345, 503, 549-550. Jones asked to sell on College Avenue, but Person insisted that he sell in the Marble Hill Housing Projects, and relatively infrequently also allowed him to sell on College Avenue. Tr. 96-99, 123-124, 128, 344-345, 549-550.

Multiple workers operated in the College Avenue area of the Bronx, working pre-set shifts, sharing customers, and using a central telephone (referred to during trial as the "Clicker"). Tr. 89-91, 285-344, 504-505, 549-550. Jones—like other sellers in the organization—would sell a minimum of two or three packs (that is, two or three grams) of crack each day. Tr. 124, 127, 313–14, 503–04. The Government also introduced a video of Mr. Jones showing himself and another person showing of large quantities of cash earned selling crack-cocaine in the Marble Hill Housing Projects and then taking a telephone order from a crack-cocaine customer. Tr. 585-86, 591-93.

The Government also called New York City Police Department ("NYPD") officers. NYPD Officer Milton Pineiro testified that he arrested Mr. Jones at the Marble Hill Housing Projects in December 2007. Tr. 262-273. He recovered crack cocaine that Jones had dropped at the site and more crack cocaine hidden on Jones's anal area. *Id*. Additionally, the jury heard testimony that Jones and two of his co-conspirators, Mr. Robert Walker and Mr. Derrick Woods, sold a dime bag[4] of crack cocaine to an undercover police officer in the College Avenue area of the Bronx in September 2006. Tr. 97-99, 325-332. According to testimony from an undercover police officer, Jones, using the Crew's Clicker, twice sold crack cocaine to an undercover police officer in the College Avenue area of the Bronx in September 2008. Tr. 285–295, 730–31. On June 17, 2009, Mr. Jones was arrested at his apartment in the Promenade building, 150 West 225th Street in the

---

[4] A dime bag refers to a $10 ziplock bag of crack-cocaine. *See* Amended Pre-Sentence Report ¶ 18; Tr. 327-328.

4

Bronx. Tr. 398-404. After the arrest, NYPD officers searched the apartment and they found crack-cocaine packaging materials—ziplock baggies (the size of dime bags), a glass plate with a razor, and crack-cocaine residue—, as well as crack cocaine from outside the window of the apartment. Tr. 402-404, 409-410.

## II.   Jones's Defense

Jones was represented by Amelio Marino, Esq. Mr. Jones's counsel conducted a cross-examination of the Government's witnesses and Mr. Jones testified on his own behalf. *See* Tr. 150-162, 169-245, 253-257 (cross-examination of Mr. Robert Walker), Tr. 273-275 (cross-examination of Mr. Pineiro), Tr. 376-391 (cross-examination of Mr. Jerimiah Smith), Tr. 414-15 (cross-examination of Mr. Thomas Gergley), Tr. 470-483 (cross-examination of Mr. Thomas Macdonald), Tr. 530-553 (cross-examination of Mr. Karon Powell), Tr. 598-610 (cross-examination of Mr. Rodriguez Riveros), Tr. 732-737 (cross-examination of undercover agent witness), Tr. 622-674, 724 (testimony of Mr. Jones). Trial counsel used cross-examination to challenge the credibility of the Government's witnesses.

Mr. Jones testified that he had purchased ten grams of crack cocaine from "K" on Fordham Road, which was the only crack he ever bought. Tr. 632-33. According to Jones, he purchased the ten grams to sell, he did not know how to bag or sell crack cocaine when he bought those 10 grams, and he first sold crack cocaine "in [his] area," including giving some away for free. Tr. 637-38. Mr. Jones also testified that he sold to the undercover officer twice in September 2008, as well as to stragglers in the College Avenue area. Tr. 646–48. However, Mr. Jones denied using the Clicker with other members of the conspiracy. Mr. Jones testified that his phone had died, another member of the conspiracy lent him the Clicker, the undercover officer called the Clicker, Mr. Jones happened to have crack-cocaine on him that day and sold the drugs to the undercover officer, and

then, another day, Jones borrowed the Clicker, dialed a phone number beginning with "646-678," which Jones remembered was the undercover officer's number, and sold more crack cocaine to the officer. Tr. 645–47. Mr. Jones testified on direct examination to have sold a total of approximately seven grams of crack cocaine over several years. Tr. 641.

Mr. Jones also testified that although he knew Person and Smalls, he did not know the other members of the conspiracy more than casually. Tr. 633-37, 645. Mr. Jones also denied that any of the co-conspirators cooked crack cocaine or stored guns in his apartment in the Promenade building. Tr. 654–60 ("there wasn't no suspicions that they was doing any drug activities or guns in there."). During the trial, Mr. Jones watched the video recording of himself and his colleague showing off their cash and engaging in a crack-cocaine sale. He denied that the money was drug money, and he testified that they were just smoking marijuana and that he was not selling crack cocaine via his cellular telephone. Tr. 662–67.

While he was cross-examined, Mr. Jones denied working with his co-conspirators to sell crack cocaine to an undercover police officer in September 2006, which conflicted with testimony from a cooperating witness and the undercover officer himself. Tr. 686-88. He also testified that he "never gave [his] number out to anyone to call me" with regard to drug sales. Tr. 713. However, when confronted with text messages from his phones, Mr. Jones admitted they were with a crack-cocaine "customer" who had his phone number but explained she "wasn't an actual customer". Tr. 717-18. Additionally, the Government recalled the undercover police officer who twice purchased crack cocaine from Jones in 2008 when Jones was using the Clicker on rebuttal. He testified that he had never had or used a cellular telephone with a telephone number beginning with "646-678," and otherwise contradicted details of Jones's testimony about the 2008 sales to the undercover officers. Tr. 730–31.

In closing arguments, defense counsel argued that Mr. Jones sold drugs "on his own," and that he sold only ten to twelve grams of crack-cocaine. Tr. 883. Defense counsel also argued that guns were not used for the drug operation, Tr. 888, and that Mr. Jones did not belong to this conspiracy. Tr. 892-893.

### III.   Verdict, Sentence, and Appeal

On May 22, 2012, the jury returned its verdict, finding Jones guilty on Count One of the Indictment—including a special finding that Jones was responsible for 280 grams and more of crack cocaine—and finding Jones not guilty on Count Two of the Indictment. Tr. 994-996.

The Court initially set Jones's sentencing hearing for October 9, 2012. Tr. 997. The Probation Office calculated Jones's advisory sentencing range under the United States Sentencing Guidelines (the "Guidelines," or "U.S.S.G."). Using the Guidelines manual in effect as of November 1, 2011, the Probation Office found that, because Jones was "liable for the distribution of at least 8.75 kilograms of crack," his base offense level was 38, pursuant to U.S.S.G. § 2D1.1(c)(1). Opp. at 9 (citing PSR ¶ 33[5]). The Probation Office applied a two-level enhancement because Jones "possessed a firearm in relation to the instant offense." *Id.* (citing PSR ¶ 34). The Probation Office also applied a two-level enhancement because Jones "maintained a premises for the purpose of manufacturing or distributing a controlled substance." *Id.* (citing PSR ¶ 35). However, "as is the practice of this [Probation] Office," the Probation Office declined to apply an enhancement for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, as a result of Jones's perjurious trial testimony, instead deferring to Judge Batts. *Id.* (citing PSR ¶ 38). As a result, the Probation Office found that Jones had a total offense level of 42—without the obstruction-of-

---

[5] The Government cites to the original Pre-Sentence Report prepared by the Probation Office. All references to the "PSR" refer to the original PSR cited to by the Government in its opposition to the Petition. As directed by Judge Batts, the Pre-Sentence Report was amended on July 7, 2015.

justice enhancement—and was in Criminal History Category I, resulting in an advisory sentencing range of 360 months' to life imprisonment, with a mandatory minimum term of ten years' imprisonment. *Id.* (citing PSR ¶¶ 41, 50,77–78).

On August 13, 2012, Mr. Jones submitted a sentencing memorandum. 09-cr-00983, ECF No. 104. Jones disputed the applicability of a weapons enhancement, pursuant to U.S.S.G. § 2D1.1(b)(1), pointing out that he was acquitted of Count Two. *Id.* at 3. Additionally, Jones argued that he did not merit an obstruction-of-justice enhancement, pursuant to U.S.S.G. § 3C1.1, stating that it was his "position that he testified truthfully at the trial and did not commit perjury." *Id.* Jones also urged the Court to find that he was eligible for "safety valve" relief, pursuant to U.S.S.G. § 5C1.2 and 18 U.S.C. § 3553(f). *Id*

On October 2, 2012, the Court issued an order *sua sponte*: "Due to exigencies outside of the Court's control, the sentencing is SINE DIE, and will be rescheduled at a later date." 09-cr-00983, ECF No. 112. Jones's trial counsel was relieved shortly thereafter, and new counsel was appointed for sentencing. On August 23, 2013, new defense counsel submitted a new sentencing memorandum on behalf of Jones. 09-cr-00983, ECF No. 141. In that memorandum—in which Jones no longer sought safety-valve relief—Jones sought a below-Guidelines sentence of the 120-month minimum term of imprisonment. *Id*.

On January 13, 2014, the Court issued two orders regarding Jones's sentencing. In the first order, the Court ordered the Government to "provide the Court with information regarding the quantity of 'nickel' bags and 'dime' bags that can be made from 10–12 grams of 'crack' cocaine" and "reconcile the information with that contained in Defendant Jones's Pre- Sentence Investigation Report." Order, 09-cr-00983, ECF No. 160. The Government responded the next day. 09-cr-00983, ECF No. 163.  In the second order, the Court found that there was "no indication

that a witness testified about firearms in connection with the narcotics offense" and ordered Jones to "be produced in the presence of counsel to make a [safety-valve] proffer to the Government pursuant to United States Sentencing Guidelines Manual § 5C1.2(a)(5). Order, 09-cr-00983, ECF No. 161.

On February 5, 2014, the Government met with Jones. Jones proffered, largely adhering to the 12-gram story to which he testified during his cross-examination at trial. *See* 09-cr-00983, ECF No. 171 at 4. The Court held a sentencing hearing on June 17, 2014. Sentencing Tr., 09-cr-00983, ECF No. 185. The Court calculated Jones's advisory Guidelines range using the 2008 Guidelines. First, the Court calculated Jones's base offense level to be 32 because "[t]here were no drug ledgers introduced at trial [and] [t]he defendant was found by the jury to have conspired to distribute and possess 280 grams and more of crack cocaine, not 8.75 kilograms." Sentencing Tr. 24. Second, the Court declined to impose the weapons enhancement. Sentencing Tr. 25. Third, the Court imposed a two-level obstruction-of-justice enhancement, finding that Jones's "testimony at trial . . . was not credible," and that the jury found Jones's "testimony about the crack not credible." Sentencing Tr. 26. Fourth, the Court found that Jones was "not safety valve eligible because he has not truthfully provided to the government, despite the Court's ordered safety valve proffer, all information concerning the offense." *Id*. Accordingly, the Court found Jones's offense level to be 34 and sentenced Mr. Jones to a term of imprisonment of 151 months and five years' supervised release. Sentencing Tr. 27.

Mr. Jones appealed his case to the Second Circuit. He raised two primary arguments on appeal: (1) he argued that his trial attorney was ineffective because he failed to obtain what is commonly referred to in this District as "3500 material," which constitutes disclosures that the Government makes pursuant to 18 U.S.C. § 3500, Federal Rule of Criminal Procedure 26.2, and

9

*Giglio v. United States*, 405 U.S. 150 (1972); and (2) he argued that the Court imposed a procedurally and substantively unreasonable sentence, that the Court did not properly consider unwarranted sentencing disparities between Jones and his co-defendants, and that any sentence other than the mandatory minimum would be unreasonable. Opp. at 15.

On June 5, 2015, the Second Circuit issued a summary order disposing of Mr. Jones's' appeal. *Medina*, 607 F. App'x at 60. The Second Circuit dismissed Jones's ineffective assistance of counsel claim without prejudice to its renewal in a timely habeas petition. *Id*. at 61. The Second Circuit also rejected Jones' other arguments. *Id*. at 61-62.

On February 3, 2016, Jones moved to reduce his sentence, based on amendments to the Sentencing Guidelines, pursuant to 18 U.S.C. § 3582(c)(2). 09-cr-00983, ECF No. 203. The Government did not object. ECF No. 204. On March 3, 2016, the Court reduced Jones's sentence to 121 months' imprisonment—just one month more than the mandatory minimum. Order, 09-cr-00983, ECF No. 205.

### IV.     Jones' Petition

Thereafter, Jones filed a timely *pro se* Section 2255 petition on September 7, 2016. *See* Petition. On September 14, 2016, the Court ordered the Government to respond to the Petition within 30 days of the order. 09-cr-00983, ECF No. 210. On October 18, 2016, and again on March 19, 2018, the Court ordered Jones to execute a waiver of his attorney-client privilege in order to proceed with the Petition, relieving the Government of its duty to respond until after the Court received such a waiver. 09-cr-00983, ECF Nos. 212-213. On June 11, 2018, having received Jones's waiver, the Court ordered Jones's trial attorney—Amelio Marino, Esq.—to file an affidavit and the Government to respond to the Petition by August 10, 2018. 09-cr-00983, ECF No. 215. On July 24, 2018, the Government alerted the Court that it had recently learned that Mr. Marino

passed away in early 2017. 09-cr-00983, ECF No. 219. On October 10, 2018, the Court granted the Government's request for an extension. 09-cr-00983, ECF No. 228. The Government was ordered to respond on December 10, 2018, and Mr. Jones was directed to submit his reply brief, if any, by February 8, 2019. 09-cr-00983, ECF No. 228. The Government responded to the Petition on December 11, 2018. Opp., 16-cv-07107, ECF No. 14.  Mr. Jones did not file a reply brief.

On June 17, 2020, the Government filed a letter advising the Court of a recent Second Circuit decision in *United States v. Blanco,* 811 F. App'x 696 (2d Cir. 2020) (summary order). On September 21, 2020, this Court ordered Jones to respond to the Government's letter on or before October 19, 2020. To date, Petitioner has yet to reply to the Government's response or letter. The Petition is deemed fully briefed.  In February 2020, following Judge Batts' death, this case was reassigned to Judge Pauley.  In August 2021, following Judge Pauley's death, this case was reassigned to me.

The Petition, construed with the liberality afforded to *pro se* filings, raises three arguments.[6] First, Jones argues that his trial counsel, Mr. Marino, was ineffective because he failed to provide his client with 3500 materials during trial. Pet. at 4, 16. Second, Jones argues that his sentence is unconstitutional because it reflects a disparity between defendants who go to trial and those who do not. Pet. at 5, 21. Third, Jones argues that his appellate counsel was ineffective for failing to petition for a writ of *certiorari*. Pet. at 7.

---

[6] The Court notes at the outset that Mr. Jones is proceeding *pro se* and that "the submissions of a pro se litigant must be construed liberally and interpreted 'to raise the strongest arguments that they suggest.'" *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)).

11

**LEGAL STANDARD**

**I.      28 U.S.C. § 2255**

28 U.S.C. § 2255 allows a person convicted in federal court to "move the court which imposed the sentence to vacate, set aside or correct the sentence" on the grounds that it "was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack . . . " 28 U.S.C. § 2255(a). Under section 2255, a court may grant relief "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Cuoco v. United States*, 208 F.3d 27, 30 (2d Cir. 2000) (quoting *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995)) (internal quotation marks omitted); *see also* 28 U.S.C. § 2255.

When considering a section 2255 motion, a district court must hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief...." 28 U.S.C. § 2255(b). "However, the filing of a motion pursuant to § 2255 does not automatically entitle the movant to a hearing; that section does not imply that there must be a hearing where the allegations are 'vague, conclusory, or palpably incredible.'" *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013) (quoting *Machibroda v. United States*, 368 U.S. 487, 495 (1962)). "To warrant a hearing, the motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [the movant] to relief." *Id.* at 131. If it "plainly appears" from the motion, exhibits, and record of prior proceedings that the habeas petitioner is not entitled to relief, "the judge must dismiss the motion." Rules Governing § 2255 Proceedings for the United States District Courts, Rule 4(b), 28 U.S.C. foll. § 2255.

In ruling on a § 2255 motion, "the so-called mandate rule bars re-litigation of issues already decided on direct appeal" and "prevents re-litigation in the district court not only of matters expressly decided by the appellate court, but also precludes re-litigation of issues impliedly resolved by the appellate court's mandate." *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010). Additionally, "[a] second rule that applies in the Section 2255 context prevents claims that could have been brought on direct appeal from being raised on collateral review absent cause and prejudice." *Id*. at 54 (citing *Marone v. United States*, 10 F.3d 65, 67 (2d Cir.1993)); *United States v. Thorn*, 659 F.3d 227, 231 (2d Cir. 2011) ("In general, a defendant is barred from collaterally challenging a conviction under § 2255 on a ground that he failed to raise on direct appeal.").

## II.    Ineffective Assistance of Counsel

To prevail on an ineffective assistance of counsel claim, the movant must demonstrate that (1) his counsel's performance "fell below an objective standard of reasonableness" and (2) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688-694 (1984). As the Second Circuit has stated "[t]his test presents a high bar for a defendant, as *Strickland* instructs courts to apply a 'presumption of effective performance.'" *United States v. Nolan,* 956 F.3d 71, 79 (2d Cir. 2020). "'The standard of *Strickland* is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on [it].'" *Id*. (quoting *Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007)).

For the first prong of an ineffective assistance claim, a petitioner must show that his "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "When analyzing counsel's alleged deficiency, a court must 'indulge a strong presumption

that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Raysor v. United States*, 647 F.3d 491, 495 (2d Cir. 2011) (quoting *Strickland*, 466 U.S. at 689.). "Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance," *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005), because courts recognize "that counsel must have 'wide latitude' in making tactical decisions." *Id*. (quoting *Strickland*, 466 U.S. at 689). For this reason, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," and "even strategic choices made after less than complete investigation do not amount to ineffective assistance—so long as the known facts made it reasonable to believe that further investigation was unnecessary." *Id*.

For the second prong of an ineffective assistance claim, petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Petitioner "must show more than that the unprofessional performance merely 'had some conceivable effect.'" *Henry*, 409 F.3d at 63 (quoting *Strickland*, 466 U.S. at 693). "[R]easonable probability [is] one that undermines confidence in the outcome." *Lynn v. Bliden*, 443 F.3d 238, 247 (2d Cir. 2006). If petitioner fails to show prejudice, the Court "need not consider the objective reasonableness of counsel's actions." *United States v. Guang*, 511 F.3d 110, 120 (2d Cir. 2007).

## DISCUSSION

### I. Petitioner's Trial Counsel Was Not Ineffective as to the 3500 Materials

Petitioner argues that his former counsel, Mr. Marino, failed to provide him with 3500 material and that this led to the obstruction sentencing enhancement as well as to his conviction. *See* Pet. at 4 ("Ineffective Assistance of Trial Counsel which caused the Trial Court to raise the Movant's Guideline Calculation for Obstruction of Justice, for failure to inform the Movant of the

3500 material before trial so that he could aid counsel in his defense as shown in trial transcripts comparison of testimony and 3500 materials, showing where the witnesses testimony differed from the 3500 material, which would have caused a different outcome at the jury trial had the jury heard the impugning evidence from the 3500 materials.").

Because Mr. Marino cannot provide this Court with a declaration or testimony, the Government submitted a declaration of Mr. Michael D. Maimin, the Government's trial counsel. *See* Maimin Decl., 16-cv-7107, ECF No. 14-1. Mr. Maimin explained that he and his co-counsel, Ms. Jessica Masella, finalized the 3500 materials for the case on May 4, 2012, and they placed the 3500 materials "in either one or two legal-sized Redweld folders [] and left them for Mr. Marino with the Court Security Officers (the "CSOs") in the lobby [] One Saint Andrew's Plaza, New York, New York 10006." *Id*. ¶ 6. Mr. Maimin called Mr. Marino to tell him the 3500 materials were available, but Mr. Marino told me that he was not downtown at the time and indicated that he would pick the 3500 materials up the following Monday. *Id*. Mr. Maimin explains that on Monday, May 7, 2013, the Government provided the 3500 materials to Mr. Marino but that he "do[es] not remember if [he] personally handed the 3500 materials to Mr. Marino or if one of the CSOs told [him] that Mr. Marino had picked up the 3500 materials." *Id*. ¶ 8. He "do[es] remember knowing that day that Mr. Marino had received the 3500 materials." *Id*. Additionally, Mr. Maimin states that on Thursday, May 10, 2012, he saw Mr. Marino carrying what appeared to the be legal-size Redweld folder in which the Government had provided the 3500 materials in the Judge Batts' courtroom and that the folder or folders were on the defense table on other days during trial. *Id*. ¶ 9. Moreover, Mr. Maimin explains that while he could not specifically see what papers were being reviewed, he did, on more than one occasion, notice Jones "appearing to review papers that he was taking out of the Redweld folder or folders, occasionally speaking with Mr. Marino while doing

15

so." *Id*. ¶ 10. Finally, Mr. Maimin states that "in 2016, after Jones filed his Section 2255 Petition, but before Jones executed a waiver of his attorney-client privilege, [he] spoke with Mr. Marino," he "outlined for him his former client's allegations—specifically that Mr. Marino had not provided Jones with the 3500 materials before or during trial—and asked him whether, if his client explicitly waived the attorney-client privilege, Mr. Marino would submit an affidavit regarding Jones's allegations." *Id*. ¶ 11. "Mr. Marino told [him] that the allegations that Mr. Marino had not provided Jones with the 3500 materials before or during trial were false, that Mr. Marino had provided his client with the 3500 materials, and that he would be willing to submit an affidavit or affirmation so stating as soon as Judge Batts permitted him to do so." *Id*. However, due to Mr. Marino's death in early 2017, Mr. Marino never filed an affidavit.

Because Mr. Marino did provide the 3500 materials to Jones, Mr. Marino was not ineffective for failing to provide Jones with the 3500 materials. But even if Mr. Marino had not shared the 3500 materials with Jones, Jones's argument fails. As the Second Circuit has explained, "we are not aware of any authority requiring defense counsel to review with his client all of the discovery materials that counsel acquires in the course of preparing for trial." *Blanco*, 811 F. App'x at 702. "Defense counsel is not required to share and review each document from discovery and voluminous 3500 material with a defendant in preparation for trial." *Behiry v. United States*, No. 16 CR. 763 (LGS), 2022 WL 421124, at *5 (S.D.N.Y. Feb. 11, 2022), reconsideration denied, No. 16 CRIM. 763 (LGS), 2022 WL 1204561 (S.D.N.Y. Apr. 22, 2022) (citing *Blanco*, 811 F. App'x at 702).

Additionally, Mr. Jones's arguments here fail to meet both prongs of the *Strickland* test. Petitioner argues that the "3500 material could have changed the outcome of the trial," Pet. at 13, and that it could have allowed him to "assist the trial counsel" in "correct[ing] testimony and

impeach[ing] witness(es)." *Id*. at 18. In his brief, Petitioner points to statements in the 3500 materials that demonstrate Mr. Walker made inconsistent statements at trial about when he lived with his grandmother. Pet. at 18. He argues that "this constitutes Ineffective Assistance of Counsel for failing to impeach" and that "impeachment of Walker on this issue would have created doubt in the mind of the jury as to what he said relating to drugs." *Id*. at 19.[7]

"Decisions about whether to engage in cross-examination, and if so to what extent and in what manner, are strategic in nature and generally will not support an ineffective assistance claim." *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002); accord *Blanco*, 811 F. App'x at 703. The Petition does not establish that defense counsel's lack of cross-examination on this discrepancy meets Strickland's first prong. Additionally, Petitioner's argument is unpersuasive because any failure to share the 3500 materials and cross-examine Mr. Walker, Mr. Powell, and Mr. Smith on the perceived minor inconsistencies he pointed to, Pet. at 18-20, would have done little to controvert the overwhelming other evidence of guilt in this case. *See, supra*, Background Section I. Petitioner has not established a "reasonable probability" that any failure of defense counsel to review the 3500 materials would have produced a different trial outcome under *Strickland*'s second prong. *See Behiry*, 2022 WL 421124, at *5.[8]

Finally, the Petitioner argues in the brief—but not in the actual Petition—that the Court already determined that Mr. Marino was ineffective because it "admonished that [Mr. Marino] had been allowing the United States to lead the witness(es) from the beginning of the trial." Pet. at 16,

---

[7] Jones also argued that cooperating witness Smith testified about different profit margins than he discussed in his proffers, Pet. at 19–20, and that cooperating witness Karon Powell incorrectly identified Jones in Harlem on June 10, 2009, *id*. at 20.

[8] Also, as pointed out by the Government, it is unclear how Mr. Marino's alleged failure to provide Jones with the 3500 materials led to the Court's decision to impose an obstruction-of-justice enhancement.

17

20. This argument fails.[9] After objecting to a leading question, Mr. Marino explained "I haven't objected that much with regard to leading" and the Court responded, "And you should have, because they have been leading and you have been very patient, because usually I tell them you can't lead, but you have been a gentleman, no more Mr. Gentleman and no more leading." Tr. 348. The Court did not find Mr. Marino ineffective at that time, and in any event, "counsel must have wide latitude in making tactical decisions." *Henry*, 409 F.3d at 63. Tactical "decisions about when to object to questions—particularly on grounds for form—are strategic and, thus absent extraordinary circumstances . . . failures to object are not evidence of objectively unreasonable representation." *United States v. Donaldson*, 577 F. App'x 63, 66–67 (2d Cir. 2014) (summary order).

**II.     Petitioner's Sentence Does Not Implicate the Equal Protection Clause**

Jones argues that "[s]entencing disparity because one co-defendant went to trial and other co-defendants did not is a violation of the Fourteenth Amendment's Equal Protection [Clause]" and that courts must consider "nationwide sentencing disparities" and "disparities among co-defendants" when sentencing. Pet. at 5. Additionally, Jones "challenges the fact that there is a huge disparity at the [s]entencing proceeding(s) regarding sentences, even among co-defendants in the same conspiracy, which can even be attributable in part to the above[-]mentioned determination of enhancement for Obstruction of Justice." Pet. at 21. It appears that Mr. Jones is arguing that the

---

[9] Jones also argued in his brief—but not in the actual Petition—that the Court abused its discretion by not, *sua sponte*, offering a continuance after it "admonished" Mr. Marino for not objecting to leading questions. Pet. at. 18. Petitioner cites to *United States v. King*, 762 F.2d 232, 235 (2d Cir. 1985) and *United States v. Dennis*, 843 F.2d 652, 653 n.1 (2d Cir. 1988). But the Second Circuit found in those cases that the trial courts did not abuse their discretion in denying pre-trial motions for continuances. "The decision to grant or deny a requested continuance lies within the broad discretion of the district court and will not be disturbed on appeal absent a showing that abuse of that discretion substantially impaired the defense." *Dennis*, 843 F.2d at 653 n.1. It is unclear why the Court would *sua sponte* grant a continuance in this instance and how it would aid Jones. As explained by the Government, the Government reformulated its questions and Defendant's counsel could object if he believed there to be a tactical reason to do so.

disparity in sentencing came about because he went to trial and therefore, the Fourteenth Amendment is implicated by any such disparity. Mr. Jones does not cite any caselaw and states simply that "[s]entencing disparity of this nature is not equal protection of the laws. It is a form of segregated partiality on the part of the courts, which appears to be un-Constitutional in its outcome(s)." *Id*. However, as Mr. Jones points out, any disparity is at least partially attributable to the Court's determination that he obstructed justice. *Id*.; *see also* Sentencing Tr. at 26 ("The discerning jury found that the government had not met its burden on the gun charge, but did convict on the drug conspiracy charge; thus, finding the defendant's testimony about the crack not credible. And the Court agrees. Accordingly, a two level enhancement for obstruction of justice pursuant to Section 3C1.1 of the sentencing guidelines is appropriate.")

Additionally, Jones argued in the Second Circuit that his sentence was procedurally and substantively unreasonable due to disparities between his sentence and the sentences of his co-defendants and that the district court failed to explicitly consider these disparities. The Circuit Court rejected this argument. *Medina*, 607 F. App'x at 61–62. Jones may not relitigate this issue in the Petition. *See Yick Man Mui*, 614 F.3d at 53. Moreover, to the extent Jones purports to raise a new issue in the Petition, he may not do so, as he could have raised the issue on appeal and did not do so. *See Thorn*, 659 F.3d at 231.

### III.   Appellate Counsel Was Not Ineffective for Failing to Petition for a Writ of *Certiorari*

Jones argues that his appellate counsel was ineffective "for failing to file a Writ of Certiorari to the Supreme Court regarding the Appeals issue as a Fourteenth Amendment issue." Pet. at 7. Petitioner does not elaborate on this argument in his brief.  However, Mr. Jones has no right to counsel for the purpose of petitioning for *certiorari* to the Supreme Court. *See Pena v. United States,* 534 F.3d 92, 96 (2d Cir. 2008) (finding no constitutional right to assistance of

counsel beyond a first-tier appeal); *Paredes-Cordova v. United States*, No. 03-CR-987 DAB, 2015 WL 1063048, at *6 (S.D.N.Y. Mar. 9, 2015) ("Petitioner does not enjoy a constitutional right to assistance of counsel during appeals beyond his first direct appeal. Although Petitioner's appellate counsel should have informed him of his right to seek certiorari as a matter of sound professional practice, Petitioner's appellate counsel was under no constitutional duty to do so, nor to assist Petitioner in preparing his petition.") In *Nnebe v. United States*, 534 F.3d 87 (2d Cir. 2008), the Second Circuit found that, where a CJA attorney timely knew that his client wanted to file a petition for a writ of *certiorari*, drafted such a petition, and forwarded the draft petition to his client, but did not file it, the Court could engage in the "extraordinary" remedy of recalling the mandate. *Id.* at 89–92. Jones, however, has made no similar allegations here and therefore Jones's claim of ineffective assistance of appellate counsel fails.[10]

## CONCLUSION

For the foregoing reasons, the Court rejects Jones's claims and his Petition is, accordingly, **DENIED.** Because the Petitioner has failed to make a substantial showing of the denial of a constitutional right, the Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253.

**SO ORDERED.**

**Dated:   August 2, 2023**
**         New York, New York**

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**

---

[10] Petitioner also raises other issues in his brief that are not contained in his Section 2255 Petition, which only contained three grounds. Because of this, these issues are unpreserved, and the Court will not review these arguments.